### STATE v. FRANK BLACKWELDER.

#### (Filed 7 December, 1921.)

**1. Homicide—Murder—Circumstantial Evidence—Questions of Law— Questions for Jury—Trials.**

Whether the accumulated and connected strength of circumstantial evidence is sufficient as a whole to sustain a verdict of the jury of guilty in a criminal action, is for the court to decide as a matter of law, and when so held, it is for the jury to determine whether they are satisfied thereon of the defendant's guilt beyond a reasonable doubt.

**2. Same—Arrest Statutes.**

There being direct evidence upon this trial for murder that at night the deceased heard his garage on his premises, wherein was his automobile, being broken into, and upon going there saw several men, whom in the dark he did not recognize; and sufficient circumstantial evidence that the prisoner was one of these, whom he endeavored to arrest with his gun, and who fired upon him, inflicting the mortal wound, it is *held* sufficient to submit to the jury on the question whether the deceased had reasonable ground to believe the prisoner had committed a felony in his presence, under the provisions of C. S., 4235, 4543, and a verdict of murder in the second degree is sustained in this case.

CRIMINAL ACTION, tried before *Bryson, J.,* and a jury, at the April Term, 1921, of CABARRUS.

Frank Blackwelder and Sid McDaniel were indicted for the murder of M. W. Allman, but Blackwelder only was tried. When the case was called for trial, the solicitor announced that he would not request a verdict for murder in the first degree, but only for murder in the second degree, or for manslaughter, as the evidence might warrant. The jury returned a verdict against Blackwelder for murder in the second degree.

The judgment of the court was pronounced, and the defendant, having entered exceptions of record, appealed to the Supreme Court.

There was evidence for the State tending to show the facts to be as follows: M. W. Allman resided in Carbarrus County, some distance from Concord, the county-seat, and about a quarter of a mile from the cross-roads. On the occasion hereinafter referred to, he, his wife, and his son were at his home. Between one and two o'clock on the morning of 4 January, 1921, the defendant arrived at Concord on a train which had come from Charlotte, and at the station met McDaniel and a man named Jones. The defendant, after a conversation with the other two, went to the Hartsell mill, and took a pistol and some cartridges from a traveling bag which he had left at the home of McDaniel's mother. About two o'clock these three men left Concord in a Ford car, and went in the direction of the place at which the deceased lived, and about four o'clock in the morning a car passed the residence of the deceased, and stopped in front of his garage, which was about fifty yards from the residence; the wife of the deceased about this time heard the door of the car close, and raised the curtain, looked through the window, and saw the car go on down the road. In about three minutes the car returned, and again passed the residence of the deceased, and stopped at a distance of about forty or fifty yards from the house in the road leading to Concord. The deceased, his son, and his wife had been disturbed by the noise, and the deceased going out to make an investigation, called out, "What are you doing there?" Just prior to this time, or about this time, the son of the deceased heard the door of the garage open, and taking the shotgun went to the piazza and fired the gun twice. The car which had stopped beyond the house thereupon moved on in the direction of Concord, and the deceased and his son a few minutes thereafter took the car of the deceased from the garage and went in pursuit of the other car a distance of about two miles, when failing to overtake it, they returned in the direction of their home. When about a mile from home, the deceased and his son met the defendant and McDaniel in the road coming from the direction of their residence, and apparently going toward Concord. Upon their meeting, the deceased had the car stopped, and entered into a conversation with the defendant and McDaniel. The deceased inquired where Blackwelder and McDaniel were going, and they said they were going to Concord. The deceased asked where they were from, and they said from Georgeville. The deceased asked their names, and Blackwelder said his name was Smith. The deceased inquired whether the car had run off and left them, to which Blackwelder answered "No." The son of the deceased then got out of the car, walked in front of it, and the deceased thereupon told Blackwelder and

McDaniel to come in front of the car so that he might see them in the light.    They came in front of the car, and Blackwelder inquired whether the deceased knew them.    The deceased said he did not, got out of his car, took a position near his son, and said to Blackwelder and McDaniel, "Why do you hold your hands so closely in your pockets?  You have a gun, haven't you?"   Blackwelder and McDaniel had their hands in their overcoat pockets, and Blackwelder said "Yes." . The deceased took the shotgun which his son had.    He had previously asked Blackwelder and McDaniel if they had been in his garage, and each of them said "No."    The deceased said, "I have reason to believe you are the two fellows I ran out of my garage a few minutes ago."    He asked them to take their hands out of their pockets, and Blackwelder remarked, "There is no use of that."    The deceased then said, "If you were not in my garage at the time mentioned, why do you refuse to take your hands out of your pockets?"   Blackwelder and McDaniel then began shooting with pistols, and the defendant fell at the first shooting.    The shotgun which he held was fired as he fell, and again after he had fallen to the ground. The son was shot in each shoulder.    McDaniel shot him and Blackwelder shot the deceased.    They fired four or five times before the shotgun was fired.    Blackwelder was shot in the hand, and as he and McDaniel ran away, the son of the deceased fired two shots at them.    The shotgun was the only weapon in the possession of the deceased and his son.    The deceased was shot on the morning of 4 January, and died at three o'clock on the morning of the 7th.    The defendant Blackwelder was a mechanic, and worked in one of the mills at Concord, and had mechanic's tools which he kept in his suitcase.    On the morning following the homicide, defendant's glove and a pair of bolt nippers were found on the ground near the scene of the shooting.    The defendant had previously pleaded guilty of carrying a concealed weapon and of larceny in Mecklenburg County, and had been sentenced to the roads for a term of two years. He had served about thirteen months when he was pardoned.    He had been charged with breaking into a store at Mooresville, and had been arrested on another occasion, and, it seems, had been released after trial. There was evidence tending to show that the general reputation of the defendant was bad.    It had been raining for some time before the shooting took place, and the deceased, in his dying declaration, said that he noticed when he met Blackwelder and McDaniel that they had very little mud on their shoes, though the road from his house to the scene of the shooting was very muddy.

The State contended that Blackwelder, McDaniel, and Jones had gone in a car from Concord to the residence of the deceased for the purpose of committing larceny of the car which the deceased had locked in his garage; that Jones drove the car, and that Blackwelder and McDaniel

got out of the car when it stopped in front of the garage, broke the door, and were in the act of taking the car away when they were frightened by the deceased and by the firing of the gun; that the night was dark, and after their car had left them, they secreted themselves and made their way cautiously in the direction of Concord, traveling as little as possible in the road. The State contended that Blackwelder and McDaniel at the time of the shooting had committed a felony, and that they were affected with notice of the statute which gave the deceased a right to arrest them without warrant.

The defendant contended that he, McDaniel, and Jones had gone from Concord in search of liquor, and that they left their car near the place of the shooting, while Jones went alone for the purpose of getting the liquor and bringing it to the defendants in the car; that it was their purpose, after getting it, to return to Concord; that Blackwelder and McDaniel were secreted within a short distance of the road when the two cars referred to passed in the direction of Concord; that neither Blackwelder nor McDaniel knew anything about the other car, had not been in it, had not gone to the residence of the deceased, knew nothing of the attempted larceny of the car owned by the deceased, and that the deceased did not have any reasonable ground for believing that they had broken the garage and attempted to take his car. The defendant further contended that when the four met in the road, the deceased required Blackwelder and McDaniel to walk in front of the car, and to hold up their hands; that the defendant thereupon said, "Please don't shoot me; give me a living chance"; that the deceased immediately thereupon fired his gun and shot Blackwelder's hand out of his pocket; that Blackwelder then began shooting his pistol with the other hand; that he shot once or twice, started to leave the road, stepped into a ditch and fell; that the gun was fired directly over him, and as soon as he recovered himself, he began shooting again. The defendant contended that he and the deceased were at arms length; that the deceased had no right to arrest him; and that he shot the deceased, if at all, upon the principle of self-preservation, and insisted upon the law of self-defense in his exoneration.

The court admitted evidence tending to show all the occurrences at the residence of the deceased and at the garage, to which the defendants excepted, and the defendant thereafter moved to strike the evidence from the record, and upon the court's declining the motion, again excepted. The first five exceptions relate to the admission of evidence as to what took place at the residence and at the garage.

The defendant excepted to the court's charge to the jury as set out in the opinion of the court. This is the defendant's sixth exception.

*Attorney-General Manning and Assistant Attorney-General Nash for the State.*

*L. T. Hartsell and J. L. Crowell for defendant.*

ADAMS, J. The State's theory of the case is diametrically opposed to that of the defendant. At the trial the State contended that Black-welder and McDaniel, in the presence of the deceased, had broken and entered into his garage with intent to steal his car, and were, therefore, guilty of a felony, for the commission of which the deceased had a legal right to arrest them without a warrant. C. S., 4235, 4543.

The defendant contended that neither he nor McDaniel had gone to the garage of the deceased; and that the deceased, having no authority to make the arrest, fired the first shot, and the defendant acted in self-defense.

The two sections referred to are as follows:

"If any person, with intent to commit a felony or other infamous crime therein, shall break or enter either the dwelling-house of another otherwise than by a burglarious breaking, or any storehouse, shop, ware-house, banking-house, counting-house, or other building where any mer-chandise, chattel, money, valuable security, or other personal property shall be, or any uninhabited house, he shall be guilty of a felony, and shall be imprisoned in the State's Prison or county jail not less than four months nor more than ten years." C. S., 4235.

"Every person in whose presence a felony has been committed may arrest the person whom he knows, or has reasonable ground to believe, to be guilty of such offense, and it shall be the duty of every sheriff, coroner, constable, or officer of police, upon information, to assist in such arrest." C. S., 4543.

When we consider the conflicting theories, we cannot escape the con-viction that evidence of what occurred at the garage was material, if not absolutely necessary to a determination of the question whether the defendant had committed a felony under such circumstances as would justify his arrest by the deceased without a warrant. Neither the de-ceased, nor his wife, nor his son identified either the defendant or McDaniel at the garage. Wherefore, the immediate inquiry is whether the evidence as to what took place there, taken in connection with other evidence, was of such probative force as required its submission to the jury, or whether it was so indefinite and remote as to preclude its con-sideration.

The defendant's objection to this evidence rests upon the contention that there was not a particle of testimony tending to show that the defendant had gone to the garage, or that he had been seen near the home

of the deceased; and that the deceased, therefore, could not have had any reasonable ground for believing that the defendant had attempted to steal the car.

True, the evidence as to the attempted larceny of the car was circumstantial, but not for that reason incompetent, for, says Starkie, "Circumstantial evidence is essential to the well-being, at least, if not to the very existence of civil society." Starkie on Evidence, p. 839. All evidence is direct or indirect. Direct evidence is that which is immediately applied to the fact to be proved, while circumstantial evidence is that which is indirectly applied by means of circumstances from which the existence of the principal fact may reasonably be deduced or inferred. In other words, as has been said, circumstantial evidence is merely direct evidence indirectly applied. "In a legal sense, presumptive evidence is not regarded as inferior to direct evidence. The two are parts of one system of means, intended to aid, and not to thwart, each other. Circumstantial evidence is often used as an aid to, and frequently as a test of, direct evidence. It is admissible in both civil and criminal cases in the absence of direct evidence, and is often the only means by which a fact can be proved. This is particularly the case in criminal trials where the act to be proved has been done in secrecy." 1 Jones Com. on Ev., sec. 6 b (5).

Professor Greenleaf, in drawing the line of distinction between competent and satisfactory evidence, says: "By competent evidence is meant that which the very nature of the thing to be proved requires, as the fit and appropriate proof in the particular case, such as the production of a writing, where its contents are the subject of inquiry. By satisfactory evidence, which is sometimes called sufficient evidence, is intended that amount of proof which ordinarily satisfies an unprejudiced mind beyond reasonable doubt. The circumstances which will amount to this degree of proof can never be previously defined; the only legal test of which they are susceptible is their sufficiency to satisfy the mind and conscience of a common man; and so to convince him that he would venture to act upon that conviction, in matters of the highest concern and importance to his own interest. Questions respecting the competency and admissibility of evidence are entirely distinct from those which respect its sufficiency of effect; the former being exclusively within the province of the court; the latter belonging exclusively to the jury." Greenleaf's Ev., sec. 2.

In *S. v. White*, 89 N. C., 465, it is said: "It is well settled law, that the court must decide what is evidence, and whether there is any evidence to be submitted to the jury, pertinent to an issue submitted to them. It is as well settled that if there is evidence to be submitted, the jury must determine its weight and effect. This, however, does not imply

that the court must submit a *scintilla*—very slight evidence; on the contrary, it must be such as in the judgment of the court would reasonably warrant the jury in finding a verdict upon the issue submitted, affirmatively or negatively, accordingly as they might view it in one light or another, and give it more or less weight, or none at all. In a case like the present one, the evidence ought to be such as, if the whole were taken together and substantially as true, the jury might reasonably find the defendant guilty.

"A single isolated fact or circumstance might be no evidence, not even a *scintilla;* two, three, or more, taken together, might not make evidence in the eye of the law, but a multitude of slight facts and circumstances, taken together as true, might become (make) evidence that would warrant a jury in finding a verdict of guilty in cases of the most serious moment. The court must be the judge as to when such a combination of facts and circumstances reveals the dignity of evidence, and it must judge of the pertinency and relevancy of the facts and circumstances going to make up such evidence. The court cannot, however, decide that they are true or false; this is for the jury; but it must decide that, all together, they make *some evidence,* to be submitted to the jury; and they must be such, in a case like the present, as would, if the jury believed the same, reasonably warrant them in finding a verdict of guilty. *Cobb v. Fogalman,* 23 N. C., 440; *S. v. Vinson,* 63 N. C., 335; *Wittkowsky v. Wasson,* 71 N. C., 451; *S. v. Massey,* 86 N. C., 658; *Imp. Co. v. Munson,* 14 Wall., 442; *Pleasants v. Fonts,* 22 Wall., 120."

There was evidence tending to support each of the theories above referred to. For the prosecution there was evidence tending to show that the defendant left Charlotte and arrived at Concord after one o'clock in the morning, and met McDaniel and Jones at the station; that the defendant went to the Hartsell mill, and after procuring a pistol and cartridges, started about two o'clock with McDaniel and Jones in a Ford car toward the residence of the deceased; that about two hours later a car passed by the residence and stopped in the road in front of the garage, when the car door was heard to close; that in about three minutes the car returned, passed the house, and stopped forty or fifty yards beyond; that the garage door was opened, and the deceased, who had gone out to make investigation, called out, "What are you doing there?" and about this time, or soon thereafter, his son fired a shotgun, which moved the chauffeur to "crank up" and to proceed in the direction of Concord. The evidence tends to show that in a few minutes the deceased and his son took the car from the garage and went in pursuit, but when two miles from home desisted, and on their return met the defendant and McDaniel within a mile of the garage; that deceased told the de-

fendant and his companion that he had reason to believe they had broken into the garage; that they claimed to have come from Georgeville, and the defendant gave his name as Smith. There was evidence tending to show that the defendant, who is a mechanic, kept his tools in the house from which he had taken his pistol, and that some time during the next day the defendant's glove and a pair of bolt nippers were found near the scene of the shooting. The defendant admitted that he had previously pleaded guilty of carrying a concealed weapon, and of larceny, and, having been sentenced for a term of two years, had been pardoned, after serving for a period of thirteen months.

Applying to the testimony the law which has been stated, we are of opinion that the evidence relating to the occurrences at the residence and at the garage is not so indefinite or remote as to make it incompetent, and that the trial judge properly left to the jury the weight of these and other circumstances pertinent to the questions under investigation.

The sixth exception is directed to the following excerpt from the charge of the court:

"The State says, and insists, that the deceased was acting in compliance with law in attempting, or declaring his intention to, arrest the defendant and his companion and to take them before the proper officers in the town of Concord or elsewhere where such officers might be found. The State says, and insists, that you should be satisfied beyond a reasonable doubt that a felony had been committed; that an attempt had been made to break and enter the garage of the deceased; that not only had the attempt been made, but the breaking had actually been effected and the door opened; and it was the intent of those committing such act to commit the crime of larceny and feloniously take and carry away the car, the property of the deceased; and the State says and insists that this act was committed in the presence of the deceased; that the garage was situated but a short distance from his dwelling; that hearing the noise he repaired to the front porch and opened the door, and that there he was enabled to see the bulk of the car, and that the darkness of the night only prevented his distinguishing the forms of those at the door of the garage or retreating therefrom; and the State says that this was in the presence of the deceased and under such circumstances as the law declares it to be in his presence, and that he was only prevented from actually identifying those at the door and retreating therefrom on account of the darkness of the night, and the court instructs you as a question of law that if the deceased was only prevented from seeing and distinguishing them and observing their acts by reason of the darkness, if he was in such a place as he could have otherwise seen and distinguished them, and seen their acts, then such acts as were committed in law were committed in the presence of the deceased."

To the foregoing instruction the defendant interposed these objections: (1) The deceased, at the time the shooting occurred, did not know that a felony had been committed at the garage; (2) if he knew a felony had been committed, he did not know the felon; (3) the felony, if any, was not committed in the presence of the deceased; (4) the court, in effect, instructed the jury that the deceased was acting in compliance with the law in attempting to arrest the defendant.

As to the first two grounds of exception, the answer is this: the deceased and his son, after the hinge had creaked in turning, went to the garage and found the door open, and afterwards met the defendant and McDaniel within a mile of the garage under circumstances found by the jury to be sufficient to create reasonable ground for believing that the defendant and McDaniel had attempted to take the car. The third objection is met by the decision of this Court in *S. v. McAfee*, 107 N. C., 812, in which *Justice Avery* said: "We concur with the judge below in the view expressed in his charge, that if the defendant struck his wife with the stick described by the witness at a point so near to the officer that he could distinctly hear what was said and the sound made by the blow, it would be considered in law a breach of the peace in his presence, though he could not at the time actually see the former, because it was too dark." Considering the fourth objection, we cannot concur in the defendant's interpretation of the instruction. A perusal of the charge will show that his Honor, in referring to "the defendant and his companion," was stating the contentions of the State, and that in his explanation of the law he applied the word "them" to "those at the door," and not as a necessary legal inference to the defendant and his companion. Finding no error in the record, we hold that all the exceptions must be overruled.

No error.